**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHELLE L. VAUGHN | : | |
| | : | |
| Appellant | : | No. 1500 MDA 2020 |

Appeal from the Judgment of Sentence Entered October 27, 2020
In the Court of Common Pleas of Centre County Criminal Division at
No(s):  CP-14-CR-0001366-2019

BEFORE:     PANELLA, P.J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McCAFFERY, J.:                **FILED: August 20, 2021**

Michelle L. Vaughn (Appellant) appeals from the judgment of sentence entered in the Centre County Court of Common Pleas, following her non-jury trial convictions of two counts of driving under the influence of alcohol[1] (DUI). Appellant claims the trial court erred in: (1) denying her motion to suppress, where, Appellant maintains, her seizure was not justified under the community caretaker doctrine;[2] and (2) finding sufficient evidence to support both DUI counts.  We affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 75 Pa.C.S. § 3802(a)(1) (general impairment), (b) (high rate of alcohol).

[2] This Court has explained:

> The community caretaking doctrine has been characterized as encompassing three specific exceptions to the state and federal

*(Footnote Continued Next Page)*

We glean the following facts from the suppression hearing transcript and the trial court's suppression order. On August 3, 2019, at approximately 7:30 a.m., Joginder Grewal, the owner of a gas station in Snow Shoe Township, Centre County, observed Appellant's vehicle arrive at the gas station, and park. Inside the vehicle were a female driver and a female passenger. N.T. Omnibus Pretrial Motion, 2/10/20, at 6. The "vehicle was not obstructing other cars from entering or exiting the . . . gas station." Suppression Order at 2. At approximately 10:15 a.m., a red vehicle arrived, the passenger in Appellant's vehicle got into the red vehicle, and the red vehicle left. *Id.* "After finding [Appellant] unconscious in the driver seat . . . and being unable to

_____

> constitutional requirements that police obtain a warrant prior to conducting an unreasonable search or seizure[, including] the public servant exception, . . . sometimes referred to as the public safety exception. Each of the exceptions contemplates that the police officer's actions be motivated by a desire to render aid or assistance, rather than the investigation of criminal activity.

*Commonwealth v. Hampton*, 204 A.3d 452, 455 n.3 (Pa. Super. 2019), *citing* *Commonwealth v. Livingstone*, 174 A.3d 609, 626-27 (Pa. 2017).

Additionally, we acknowledge the recent decision in *Commonwealth v. Alexander*, 243 A.3d 177 (Pa. 2020), in which the Pennsylvania Supreme Court overruled *Commonwealth v. Gary*, 91 A.3d 102 (Pa. 2014) (plurality). *Alexander* returned to the pre-*Gary* lines of cases and held "the Pennsylvania Constitution requires both a showing of probable cause and exigent circumstances to justify **a warrantless search of an automobile**." *Alexander*, 243 A.3d at 180 (emphasis added). *Alexander* is not implicated in this case, as there was no search of Appellant's vehicle. *See* Opinion & Order, 5/13/20 (Suppression Order), at 2 ("At no point in time did [the trooper] conduct a search of [Appellant's vehicle].").

wake her, Grewal called the police and requested a welfare check to make sure [Appellant] was not injured or in need of assistance." *Id.* at 1.

Pennsylvania State Trooper Ryan Maggs responded to the call and arrived at the gas station at 10:40 a.m. Suppression Order at 2. Neither Grewal nor dispatch had reported any criminal activity. "The vehicle had not moved for a period of three hours prior to Trooper Maggs' arrival[,]" and Appellant had not exited the vehicle. *Id.* at 1, 2. When Trooper Maggs arrived, a sergeant of the Fish Commission, who "was getting fuel there," was talking with Appellant, who was now conscious. N.T. Omnibus Pretrial Motion, 2/10/20, at 20.

The trial court made the following findings of fact:

9. [Appellant's] car key was not in the ignition, the motor was not running, and none of the lights were on.

* * *

11. Upon making contact with [Appellant], Trooper Maggs immediately noticed the smell of alcoholic beverage emanating from her breath, and her speech was slurred and incoherent.

12. At no point in time did Trooper Maggs conduct a search of [Appellant's] vehicle.

13. Trooper Maggs observed a thirty-pack of Budweiser beer in the backseat with some of the containers missing and not visible within the vehicle, but no containers were open.

14. [Appellant] admitted to drinking Budweiser beer the previous night, but denied consuming any alcohol after arriving at the [gas] station that morning.

15. [Appellant] denied, but [then] admitted to driving to the gas station from a camp in Kato.

\* \* \*

19. Troopers Maggs asked [Appellant] to perform a field sobriety test, which [Appellant] failed.

20. At that point in time, Trooper Maggs concluded [Appellant] was unable to safely operate a vehicle and placed her under arrest for [DUI].

21. [Appellant] was transported to [the hospital], where she consented to have her blood drawn.

22. The blood test showed [Appellant's] blood alcohol content was .127 percent.

Suppression Order at 2-3.

Trooper Maggs filed a criminal complaint, charging Appellant with DUI under both Subsection 3802(a)(1) (general impairment) and Subsection 3802(b) (high rate of alcohol). On November 20, 2019, Appellant filed an omnibus pre-trial motion, seeking suppression of the evidence and arguing her seizure and arrest were illegal. The trial court conducted a hearing on February 10, 2020. The sole witness was Trooper Maggs, who testified to the facts as summarized above.

On May 13, 2020, the trial court issued an opinion and order, denying Appellant's suppression motion. Generally, it found: (1) the initial interaction between the trooper and Appellant did **not** constitute a seizure or restraint; (2) furthermore, Trooper Maggs' initial interaction with Appellant was justified

under the community caretaker doctrine;[3] (3) when the trooper directed Appellant to exit the vehicle and perform field sobriety tests, the interaction transitioned into an investigation detention; and (4) the investigative detention was supported by reasonable suspicion of unlawful activity, based upon Trooper Maggs' observations of Appellant.

The case proceeded to a stipulated non-jury trial on September 8, 2020. The parties stipulated to: (1) what the blood alcohol test lab personnel would testify to; (2) Trooper Maggs' "MVR" video, played without sound for the court, and (3) the suppression hearing transcript. N.T. Non-Jury Trial, 9/8/20, at 3-4. Neither party presented any further evidence. The trial court found Appellant guilty of both counts of DUI, specifically concluding: (1) she was in actual physical control of the vehicle, as she admitted she drove to the gas station; and (2) furthermore, she admitted she "consumed Budweiser beer the night before but not that morning," and she did not satisfactorily complete the field sobriety tests. 1925(a) Op., 2/8/21, at 2-3.

On October 27, 2020, the trial court sentenced Appellant to six months' probation with restrictive conditions. Appellant did not file a post-sentence motion, but filed a timely notice of appeal on November 25, 2020. She

---

[3] As we discuss *infra*, the trial court's first two findings are somewhat incongruous. *See Livingstone*, 174 A.3d at 621, 625 (court shall first determine whether the defendant was seized, and **if** so, then consider whether the seizure was justified under the Fourth Amendment and the community caretaker doctrine).

subsequently complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

On appeal, Appellant raises the following issues for our review:

I. Whether the Lower Court erred in denying [Appellant's] Motion to Suppress.

II. Whether the Commonwealth met its burden of proving beyond a reasonable doubt that [Appellant] was in actual physical control of the movement of a vehicle when the vehicle was parked in a parking lot and the engine was not running and no one saw her driving or operating the vehicle.

Appellant's Brief at 9.

Appellant first challenges the denial of her suppression motion, arguing the trial court erred in finding the "seizure" was justified under the community caretaker doctrine. Appellant's Brief at 19. In support, Appellant avers the initial report to police was merely of "a woman . . . in a vehicle who didn't respond to knocking on her window or yelling," and there was no mention of any possible overdose, serious injury, or vehicle accident.[4] *Id.* at 18.

_____

[4] Appellant points out that this evidence — Grewal's observations as communicated to the police — was **not** offered for the truth of the matter, but rather to "explain why Trooper Maggs did what he did." Appellant's Brief at 18. Although not entirely clear, it appears Appellant is arguing this Court should, therefore, likewise not accept as true the contents of the call. *See id.* ("Appellant stresses to this Honorable Court to review carefully how the lower court ruled on certain testimony. . . . The [trial court] recognized that what Trooper Maggs testified to regarding the reason for dispatch was not being used for the truth of the matter asserted."). However, as we discuss *infra*, under our standard of review we "consider only the Commonwealth's evidence and so much of the [defense evidence] as remains uncontradicted when read in the context of the record as a whole." *See Hampton*, 204 A.3d at 456.

- 6 -

Furthermore, Appellant alleges Trooper Maggs' own observations would have revealed "no objective facts that would reasonably suggest [she] was in need of assistance," where she was conscious and talking and there was nothing unusual about how the car was parked. *Id.* at 18-19. Appellant maintains that Trooper Maggs questioned "her about criminal activity," and not her health and safety, and he commanded — rather than requested — her to exit the vehicle. *Id.* at 21. Appellant asserts she did not feel free to leave and thus "the encounter became a seizure which was not supported by . . . reasonable suspicion." *Id.* We conclude no relief is due.

We first note the standard of review of the denial of a suppression motion:

> We may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. An appellate court, of course, is not bound by the suppression court's conclusions of law.

*Hampton*, 204 A.3d at 456, *quoting* *Livingstone*, 174 A.3d at 619.

The Pennsylvania Supreme Court

> has recognized three categories of interaction between citizens and the police. The first is a mere encounter, or request for information, which need not be supported by any level of suspicion. The second category of interaction, an investigative detention or *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1 . . . 20 L.Ed.2d 889 (1968), "subjects an individual to a stop and period of detention but is not so coercive as to constitute the functional equivalent of an arrest." To survive constitutional scrutiny, "an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal

- 7 -

activity and may continue only so long as is necessary to confirm or dispel such suspicion." Finally, an arrest or custodial detention must be supported by probable cause to believe the person is engaged in criminal activity.

*Livingstone*, 174 A.3d at 613 n.1.

The community caretaker doctrine and public safety exception may apply if a court has found there was a seizure or investigative detention. *See Livingstone*, 174 A.3d at 621, 625 (court "must first determine whether [the defendant] was seized by considering whether a reasonable person in [her] shoes would have believed she was free to leave," and if finding so, then "proceed to determine whether" the detention was justified under the community caretaker doctrine). *See also id.* at 619-20 ("[I]f community caretaking were just another name for consensual encounters, there would have been no need for courts to formulate the exception in the first place.").

"[E]ven community caretaking activity must be performed in accordance with Fourth Amendment protections." *Livingstone*, 174 A.3d at 629.

> [I]n order for a seizure to be justified under the public servant exception to the warrant requirement under the community caretaking doctrine, **the officer must point to specific, objective, and articulable facts which would reasonably suggest to an experienced officer that assistance was needed**; the police action must be independent from the detection, investigation, and acquisition of criminal evidence; and, based on a consideration of the surrounding circumstances, the action taken by police must be tailored to rendering assistance or mitigating the peril. **Once assistance has been provided or the peril mitigated, further police action will be evaluated under traditional Fourth Amendment jurisprudence.**

*Id.* at 637 (emphases added).

Here, the trial court found the initial interaction was appropriate under the community caretaker doctrine.[5] Suppression Order at 5, 7. The court emphasized the gas station owner, Grewal, was "concerned upon observing [Appellant's] vehicle parked in the lot for a three-hour period . . . and [unsuccessfully] arousing" her. *Id.* at 9-10. The court considered that Trooper Maggs' presence "was **requested** to make sure [Appellant] was not injured or in need of assistance," and this was "not a situation wherein Trooper Maggs[ ] was investigating criminality." *Id.* at 9. The court concluded a "reasonable person in [Appellant's] shoes and under the circumstances would understand the officer's initial presence as the rendering of assistance." *Id.* at 9. We agree.

_____

[5] As stated above, the trial court also found the initial interaction was **not** a seizure. *See* Suppression Order at 7 ("[T]here clearly was no seizure until [Appellant] was asked to exit the vehicle and perform the field sobriety tests[;]" "Trooper Maggs' initial response to the phone call and observation of the problem did not amount to any restraint."), 9 ("[I]t cannot be argued Trooper Maggs' initial response to the call constituted a restraint of [Appellant] prior to asking her to exit her vehicle."). If so, as court itself properly observed, the inquiry concluded and there was no need to further consider the community caretaker doctrine. *See id.* at 7 ("[I]t is imperative to first determine if Trooper Maggs' actions amounted to a seizure. Second, **if it is determined** there has been a seizure, the Court must determine whether the community caretaker doctrine applies."); *Livingstone*, 174 A.3d at 621, 625.

Nevertheless, Appellant does not challenge this finding on appeal. We do not disturb the trial court's conclusion — that "whether [Appellant] was seized at the beginning of the interaction or sometime later is of no consequence to the outcome of the matter. In either scenario, the seizure was justified by the reasonableness of Trooper Maggs' actions." *See* Suppression Order at 7. *See also Commonwealth v. Doty*, 48 A.3d 451, 456 (Pa. Super. 2012) (this Court may affirm on any basis).

The crux of Appellant's argument on appeal is that there were no objective facts indicating she was in need of assistance. We conclude, however, that her supporting discussion goes to the weight of the evidence presented — whether there was anything "unusual about how . . . the vehicle was parked," and that by the time Trooper Maggs arrived, she was "conscious and talking." **See** Appellant's Brief at 18. Under our standard of review, we "consider only the Commonwealth's evidence and so much of the [defense evidence] as remains uncontradicted when read in the context of the record as a whole." **See Hampton**, 204 A.3d at 456. We are bound by the trial court's findings of fact, and thus do not disturb the weight accorded to the evidence presented. **See id.**; **Carter**, 105 A.3d at 773. Here, we find record support for the trial court's factual finding that the initial interaction was not related to any "detection, investigation, and acquisition of criminal evidence," and that trooper "point[ed] to specific, objective, and articulable facts which would reasonably suggest to an experienced officer that assistance was needed." **See** Suppression Order at 9; **Livingstone**, 174 A.3d at 637.

Finally, we observe the crux of Appellant's discussion goes to the **initial** safety and welfare check. To the extent she also challenges the **subsequent** interaction, we would conclude no relief is due. As stated above, the trial court found that following the public safety check, the interaction "transitioned into an investigative detention" when the trooper directed Appellant to exit the vehicle and perform sobriety tests. Suppression Order at 7. The court

- 10 -

further found this investigative detention was supported by reasonable suspicion:

> Troopers Maggs **immediately** noticed several indicators of intoxication such as . . . slurred and incoherent speech, and the immediate odor of alcohol emanating from her person. Additionally, a case of beer with missing bottles was observed in the rear of the vehicle.

Suppression Order at 10.

Appellant does not challenge these findings on appeal, and in any event, we would conclude the record evidence supports the trial court's findings. *See Livingstone*, 174 A.3d at 613 n.1; *Hampton*, 204 A.3d at 456. Finally, we note Trooper Maggs' ultimate arrest was supported by probable cause that Appellant was engaged in criminal activity, namely DUI. *See Livingstone*, 174 A.3d at 613 n.1. In addition to the above observations by Trooper Maggs, by the time he arrested Appellant, she had also failed to satisfactorily perform the field sobriety tests. Accordingly, we do not disturb the trial court's suppression ruling.

In her second issue, Appellant claims the evidence was insufficient to sustain her two convictions of DUI. In support, she asserts the following. First, under the general impairment subsection (75 Pa.C.S. § 3802(a)(1)), the Commonwealth "**must** sufficiently relate the defendant's impairment to the actual time of driving or operation." Appellant's Brief at 23-24. However, here, "the Commonwealth produced absolutely no evidence . . . establishing the time of [her] drinking[ nor] the time of [her] driving." *Id.* at 30. "The

Commonwealth only called Trooper Maggs who testified that he responded to a . . . dispatch about a car that had been parked . . . for about three hours." *Id.* at 23-24. "Appellant did not make a critical admission that she had been drinking before driving or operation [of] her car. She only admitted to drinking the night before without any further specificity." *Id.* at 37. Furthermore, the Commonwealth did not present sufficient evidence that Appellant "was in actual physical control of the movement of a vehicle." *Id.* at 23. Upon Trooper Maggs' arrival on the scene, "the vehicle was not running[,] the keys were not in the ignition[, and t]he car was parked in a legal manner." *Id.* at 24. With respect to the sufficiency of the evidence for DUI/high rate of alcohol (75 Pa.C.S. § 3802(b)), Appellant avers the Commonwealth likewise failed to establish when she "last operated her car," and thus "failed to prove, beyond a reasonable doubt, that [she] operated her car less than two hours before her BAC" test. *Id.* at 43. We conclude no relief is due.

> Our standard of review of a sufficiency challenge is well-settled:
>
> A challenge to the sufficiency of the evidence is a question of law, subject to plenary review. When reviewing a sufficiency of the evidence claim, the appellate court must review all of the evidence and all reasonable inferences drawn therefrom in the light most favorable to the Commonwealth, as the verdict winner. Evidence will be deemed to support the verdict when it establishes each element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. The Commonwealth need not preclude every possibility of innocence or establish the defendant's guilt to a mathematical certainty. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

- 12 -

*Commonwealth v. Brotherson*, 888 A.2d 901, 904 (Pa. Super. 2005) (citation omitted).

The DUI statute provides, in pertinent part:

**(a) General impairment.**

(1) An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle.

\* \* \*

**(b) High rate of alcohol. —** An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is at least 0.10% but less than 0.16% within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle.

\* \* \*

**(g) Exception to two-hour rule. —** Notwithstanding the provisions of subsection . . . (b), . . . where alcohol . . . concentration in an individual's blood or breath is an element of the offense, evidence of such alcohol or controlled substance concentration more than two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle is sufficient to establish that element of the offense under the following circumstances:

(1) where the Commonwealth shows good cause explaining why the chemical test sample could not be obtained within two hours[.]

75 Pa.C.S. § 3802(a)(1), (b), (g)(1). The Commonwealth may establish the elements of DUI by circumstantial evidence. *Commonwealth v. Starry*, 224 A.3d 312, 318 (Pa. 2020).

Here, the trial court concluded the evidence was sufficient to sustain convictions under both the general impairment and high rate of alcohol subsections of the DUI statute. First, the court found Appellant was in actual physical control of a vehicle, emphasizing her admission, to Trooper Maggs, "that she drove to the [gas station] from a camp in Kato." 1925(a) Op. at 3. The court also considered:

> [Appellant] was seated in the driver's seat behind the wheel. Trooper Maggs smelled the odor of alcoholic beverage emanating from [her] breath. [Appellant's] speech was confusing and slurred. [She] admitted to having consumed Budweiser beer the night before but not that morning. The trooper also observed an open 30-pack of Budweiser cans in the back seat and there were cans missing.

*Id.* Additionally, Appellant did not satisfactorily complete field sobriety testing. *Id.*

We reiterate that the parties stipulated that Appellant's BAC testing result was .127%. At trial, the Commonwealth relied on Subsection 3802(g), which provides "an exception" for not "hav[ing] blood taken within the two-hour rule," if the Commonwealth "can show good cause explaining why it wasn't done." N.T., 9/8/20, at 12. The Commonwealth argued the police did not "have any concern until they" received the request to conduct a welfare check, and the BAC test was performed "within two hours of the police appearing." *Id.* at 12-13.

On appeal, Appellant presents no discussion of the BAC test-timing provision at Subsection 3802(g). Furthermore, while Appellant would

attribute no significance to her admission, to Trooper Maggs, that she drank beer sometime before driving, drove to the gas station that morning, and did not drink any alcohol after arriving at the gas station, the weight of this evidence was for the trial court to weigh. *See Brotherson*, 888 A.2d at 904. Viewing all the evidence and reasonable inferences drawn therefrom in the light most favorable to the Commonwealth, we conclude the record evidence supports the verdicts. *See id.* The trial court properly found the circumstantial evidence established beyond a reasonable doubt that Appellant was in actual physical control of the vehicle, she was "incapable of safely driving, operating or being in actual physical control," and her BAC was more than .10% within two hours of the actual physical control. *See* 75 Pa.C.S. § 3802(a)(1), (b); *Starry*, 224 A.3d at 318; *Brotherson*, 888 A.2d at 904. Accordingly, we do not disturb the judgment of sentence.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/20/2021

Hundt
Muir

**IN THE COURT OF COMMON PLEAS OF CENTRE COUNTY, PENNSYLVANIA**
**CRIMINAL ACTION - LAW**

THE COMMONWEALTH OF
PENNSYLVANIA       :    NO. CP-14-CR-1366-2019

           v.                :

MICHELLE L.VAUGHN       :

     Defendant         :

*Attorney for the Commonwealth:*       *Crystal Hundt, Esq.*
*Attorney for Defendant:*              *Karen Muir, Esq.*

**Grine, J.**

## 1925(a) Opinion

Defendant Michelle Vaughn filed a Notice of Appeal on November 25, 2020 from this

Court's Sentencing Order entered on October 27, 2020. On December 8, 2020, the Court

ordered Defenant to file a concise statement of matters complained of on appeal. On

December 28, 2020, Defendant filed a timely statement raising two issues on appeal:

I.      Whether the Lower Court erred in denying Defendant's Motion to Suppress.
II.     Whether the Commonwealth met its burden of proving beyond a reasonable doubt that Defendant was in actual physical control of the movement of a vehicle when the vehicle was parked in a parking lot and the engine was not running and no one saw her driving or operating the vehicle.

Def.'s Stmt. of Matters Compl. of on Appeal, 12/28/2020.

### Background

Defendant was charged with Count I: DUI, General Impairment Incapable of Driving

Safely, First Offense, 75 Pa. C.S.A. § 3802(a)(1) and Count II: DUI, High Rate of BAC .10. <

.16, First Offense, 75 Pa. C.S.A. § 3802(b).

A non-jury trial was held in this matter on September 8, 2020 after which the Court found

Defendant guilty. Sentencing was scheduled for October 27, 2020. On Count II, Defendant was

■ O □ RD □ S

sentenced to probation with restrictive conditions for a period of six (6) months to include a period of fifteen (15) days on in-home detention and to pay a $500.00 fine. Upon completion of the in-home detention, she was directed to serve the remainder of the sentence on standard probation. Defendant's operating privileges were suspended, she was directed to complete an alcohol safe driving course, and she was directed to undergo and participate in any evaluation and outpatient counseling program as arranged by the Centre County Probation and Parole Department. There was no separate sentence on Count I.

## Discussion

With respect to the first issue raised by Defendant, the Court relies on its Opinion and Order entered on May 13, 2020 as it fully addressed the reasoning for denying the Motion to Suppress.

As to the second issue, the Court found that Defendant was in actual physical control of the motor vehicle. 75 Pa.C.S.A. § 3802(b) provides:

> …
> (b) High rate of alcohol.--An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is at least 0.10% but less than 0.16% within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle.
> …

75 Pa. C.S.A. 3802(b).

At the September 8, 2020 non-jury trial, the parties stipulated to the admission of Commonwealth's Exhibit 1 regarding testimony of lab personnel from Mount Nittany and the Pennsylvania State Police Lab and the documents regarding the blood alcohol testing. The parties also stipulated to the Commonwealth's Exhibit 2, the MVR which the Court viewed without sound at the non-jury trial. Lastly, the parties stipulated to the admission of

2

Commonwealth Exhibit 3, the transcript from the hearing on Defendant's Omnibus Pretrial Motion in the nature of a Motion to Suppress on February 10, 2020.

"The Commonwealth can establish through wholly circumstantial evidence that a defendant was driving, operating or in actual physical control of a motor vehicle." *Com. v. Johnson*, 833 A.2d 260, 263 (Pa. Super. 2003). Determination of whether a person is in actual physical control of a vehicle is based on the totality of the circumstances. *Id.* at 266. It is not necessary the vehicle itself be in motion, "it is sufficient if the operator is in actual physical control of either the machinery of the motor vehicle or of the management of the movement of the vehicle itself." *Id.*

The evidence reflected that the owner of the Sunoco in Snow Shoe, Pennsylvania called for a welfare check because there was a woman in a vehicle of the Sunoco parking lot possibly "passed out" on the morning of August 3, 2019. When Trooper Ryan Maggs arrived at the Sunoco station, another officer, Emmett Kyler, from the Fish Commission was already there. Officer Kyler was speaking with Ms. Vaughn who was conscious at that time. Trooper Maggs approached the driver's side of the vehicle to speak with Ms. Vaughn. Ms. Vaughn was seated in the driver's seat behind the wheel. Trooper Maggs smelled the odor of alcoholic beverage emanating from Ms. Vaughn's breath. Ms. Vaughn's speech was confusing and slurred. Ms. Vaughn admitted to having consumed Budweiser beer the night before but not that morning. The trooper also observed an open 30-pack of Budweiser cans in the back seat and there were cans missing. Ms. Vaughn admitted that she drove to the Sunoco from a camp in Kato. Ms. Vaughn's vehicle was parked at the perimeter of the parking lot and not in a parking spot. Field sobriety testing was performed which Ms. Vaughn completed unsatisfactorily. Ms. Vaughn was placed under arrest for suspicion of DUI and was transported for a blood draw.

Trooper Maggs was not able to say whether the keys were in the ignition but as can be seen the MVR recording which was admitted into evidence, Ms. Vaughn's mother arrived at the scene, got into the vehicle, and drove it away.

The Court determined based on the totality of the circumstances that Defendant Vaughn was in actual physical control of the movement of the vehicle and thus found Defendant guilty. The Court hopes this Opinion aids the Honorable Superior Court in the resolution of this matter.

BY THE COURT:

Date: February 8, 2021

_____
Jonathan D. Grine, Judge

4

Circulated 08/10/2021 08:18 AM

Hundt
Muir

# IN THE COURT OF COMMON PLEAS OF CENTRE COUNTY, PENNSYLVANIA
## CRIMINAL ACTION

COMMONWEALTH OF PENNSYLVANIA :
:
V. : No. CP-14-CR-1366-2019
:
MICHELLE L. VAUGHN, :
Defendant :

*Attorney for Commonwealth:*      *Crystal L. Hundt, Esq.*
*Attorney for Defendant:*      *Karen G. Muir, Esq.*

## OPINION and ORDER

Presently before the Court is an Omnibus Pre-trial Motion in the nature of a Motion to Suppress ("motion") filed by Michelle L. Vaughn ("Defendant") on November 20, 2019 after being charged with Driving While Under the Influence. A hearing on the motion was held on February 10, 2020, and the parties were ordered to submit their findings of fact and conclusions of law. The parties' briefs were timely received, and the matter is now ripe for decision.

## FINDINGS OF FACT

1. Trooper Ryan Maggs ("Trooper Maggs") is employed with the Pennsylvania State Police, Rockview Barracks, as a state trooper.

2. Joginder Grewal ("Grewal") is the owner of the Sunoco gas station located at 529 East Sycamore Road in Snow Shoe Township, Centre County.

3. On August 3, 2019, after finding Defendant unconscious in the driver seat of a silver Mitsubishi Eclipse and being unable to wake her, Grewal called the police and requested a welfare check to make sure Defendant was not injured or in need of assistance.

4. Grewal had observed Defendant's vehicle arrive at the Sunoco at approximately 7:30 a.m. that morning, and Defendant did not exit the vehicle until Trooper Maggs arrived.

☒O ☐RD ☐S



5. Trooper Maggs was on duty and responded to the call for the welfare check.

6. Neither Mr. Grewal nor dispatch had reported any criminal activity related to Defendant.

7. Trooper Maggs received the information at 10:20 a.m. and arrived at the scene at approximately 10:40 a.m., a period of approximately twenty (20) minutes.

8. When Trooper Maggs arrived at the scene, Defendant was conscious.

9. Defendant's car key was not in the ignition, the motor was not running, and none of the lights were on.

10. Defendant's vehicle was not obstructing other cars from entering or exiting the Sunoco gas station.

11. Upon making contact with Defendant, Trooper Maggs immediately noticed the smell of alcoholic beverage emanating from her breath, and her speech was slurred and incoherent.

12. At no point in time did Trooper Maggs conduct a search of Defendant's vehicle.

13. Trooper Maggs observed a thirty-pack of Budweiser beer in the backseat with some of the containers missing and not visible within the vehicle, but no containers were open.

14. Defendant admitted to drinking Budweiser beer the previous night, but denied consuming any alcohol after arriving at the Sunoco station that morning.

15. Defendant denied, but later admitted to driving to the gas station from a camp in Kato.

16. At no point in time did Trooper Maggs observe Defendant to be in physical control of the movement of the vehicle.

17. The vehicle had not moved for a period of three hours prior to Trooper Maggs' arrival.

18. Trooper Maggs identified Defendant through her Pennsylvania driver's license.

19. Trooper Maggs asked Defendant to perform a field sobriety test, which Defendant failed.

20. At that point in time, Trooper Maggs concluded Defendant was unable to safely operate a vehicle and placed her under arrest for Driving While Under the Influence.

21. Defendant was transported to Mount Nittany Medical Center, where she consented to have her blood drawn.

22. The blood test showed Defendant's blood alcohol content was .127 percent.


CONCLUSIONS OF LAW

1. Article I, Section 8 of the Pennsylvania Constitution, and the Fourth and Fourteenth Amendments of the United States Constitution protect people from unreasonable searches and seizures.[1]

2. Pennsylvania law recognizes three categories of interaction between police and the public: (1) mere encounter, (2) investigative detention, and (3) custodial detention.[2]

3. A "mere encounter," "does not require any level of suspicion or carry any official compulsion to stop or respond." An "investigative detention," allows for the temporary detention of an individual if supported by reasonable suspicion. A custodial detention must be supported by probable cause.[3]

4. During a mere encounter, the interaction may change in nature and become an investigative detention.[4]

5. An interaction ripens from mere encounter to investigative detention when a person is legally seized.[5]

---

[1] Pa. Const. art. I, § 8; U.S. Const. amend. IV; U.S. Const. amend. XIV.
[2] *Commonwealth v. Krisko*, 884 A.2d 296, 299 (2005).
[3] *Commonwealth v. Lyles*, 97 A.3d 298, 302 (2014).
[4] *Commonwealth* v. Blair, 860 A.2d 567, 573 (2004).
[5] *See Commonwealth* v. Krisko, 884 A.2d 296, 300 (2005).

3

6. A person is legally seized when, considering all the facts and circumstances surrounding the interaction "a reasonable person would not feel free to leave [.]"[6]

7. An investigative detention carries with it "an official compulsion to stop and respond … [and] requires reasonable suspicion of unlawful activity."[7]

8. For an investigative detention to be valid, the police officer does not need to "personally observe the illegal or suspicious conduct, but may rely upon the information of third parties, including 'tips' from citizens, to determine whether reasonable suspicion of criminality exists."[8]

9. "The community caretaking doctrine is an exception to the warrant requirement and is not relevant to the determination of whether police conduct amounted to a seizure in the first instance."[9]

10. In order for the public servant exception of the community caretaking doctrine to apply the police officer must "point to specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance."[10]

11. Only after determining a seizure has occurred may the court inquire into whether the community caretaking doctrine renders the seizure reasonable.[11]

12. Where a motion to suppress is filed, the Commonwealth has the burden of proving by a preponderance of the evidence that the evidence in question was not obtained in violation of the defendant's rights.[12]

---

[6] *Commonwealth v. Adams*, 205 A.3d 1195, 1196 (Pa. 2019), cert. denied sub nom. *Pennsylvania v. Adams*, No. 18-1577, 2020 WL 1906731 (U.S. Apr. 20, 2020).

[7] *Commonwealth* v. Krisko, 884 A.2d 296, 299 (2005); *Fla. v. Royer*, 460 U.S. 491, 497–98 (1983).

[8] *Commonwealth v. Krisko*, 884 A.2d 296, 300 (2005) (citing *Commonwealth v. Wright*, 672 A.2d 826, 830 (1996)).

[9] *Commonwealth v. Hampton*, 2019 PA Super 38, 204 A.3d 452, 458 (2019), reargument denied (Apr. 15, 2019)

[10] *Id.* at 459.

[11] *Id.* at 458 (2019); *Commonwealth v. Livingstone*, 174 A.3d 609 (2017).

[12] Pa. R. Crim. P. 581; *Commonwealth v. Ruey*, 892 A.2d 802, 807 (2006).

13. Each exception to the community caretaker doctrine justifying an otherwise unreasonable seizure under the Fourth Amendment contemplates that the police officer's actions be motivated by a desire to render aid or assistance, rather than an investigation of criminal activity.[13]

14. The community caretaking doctrine is only invoked to justify an unreasonable seizure under the Fourth Amendment when police are not engaged in crime-solving activities. [14]

15. "In order for the public servant exception of the community caretaking doctrine to apply to justify a seizure under Fourth Amendment, police officers must be able to point to specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance, police caretaking; police caretaking action must be independent from the detection, investigation, and acquisition of criminal evidence, and, based on consideration of surrounding circumstances, action taken by police must be tailored to rendering assistance or mitigating the peril; once assistance has been provided or the peril mitigated, further police action will be evaluated under traditional Fourth Amendment jurisprudence." [15]

## DISCUSSION

While a warrant is generally required before an arrest or seizure, the Court believes the circumstances of the present matter fall squarely within one of the several exceptions to the general warrant requirement. Namely, the community care-taker doctrine. The Court emphasizes under Pennsylvania law, the applicability of the community caretaker doctrine is not relevant to determining whether the police officer's conduct amounted to a seizure in the first instance.

---

[13] *Commonwealth v. Livingstone,* 174 A.3d 609 (Pa. 2017).
[14] *Id.* at 21.
[15] *Id.* at 23.

5

"Implicit in any community caretaking case is the fact that there has been a seizure within the meaning of the Fourth Amendment. Otherwise, there would be no need to apply a community caretaking exception." [16]Defendant attempts to argue she was seized and not free to leave because Trooper Maggs' objectives in determining her safety were never directly communicated to her. Such a proposition is inaccurate, and would impose an unreasonable burden on police officers who find themselves in the similar, and very common, situation of observing the probability of criminal activity in the course of community caretaker actions.

The Supreme Court of the United States has not made a determination as to whether community caretaker actions constitute a stop or seizure, implicating the Fourth Amendment protections against unreasonable searches and seizures. Because of this ambiguity, state courts are significantly split on whether an initial contact during community caretaker actions should be evaluated according to Fourth Amendment principals of reasonableness. For those courts evaluating community caretaker actions under the Fourth Amendment, the majority of them ask whether a reasonable person in the defendant's shoes would feel he was free to leave. However, a blind application of this standard can become extremely problematic given the realities of every-day life and police officer interaction with civilians.

The interaction between the community caretaker doctrine and the Fourth Amendment was a matter of first impression in the Pennsylvania Supreme Court as recently as 2017 in *Commonwealth v. Livingstone.* There, our Supreme Court agreed with over half of its sister states in addressing the public servant exception under the community caretaker doctrine, and in ensuring the doctrine is employed in accordance with the Fourth Amendment protections and principles. In *Livingstone,* the court stated the public servant exception to the community

---

[16] *Id.* at 46, 620.

caretaker doctrine "contemplates that the police officer's actions be motivated by a desire to render aid or assistance, rather than the investigation of criminal activity."[17]

Based on the foregoing, it is imperative to first determine if Trooper Maggs' actions amounted to a seizure. Second, if it is determined there has been a seizure, the Court must determine whether the community caretaker doctrine exception applies. Contemporaneously, the reasonableness of the officer's actions in his caretaker role must be evaluated in accordance with Fourth Amendment protections and balanced with the public interest in officer safety services.

The Court finds there clearly was no seizure until Defendant was asked to exit the vehicle and perform the field sobriety tests. Next, although Defendant was legally seized when asked to exit the vehicle, the Court finds the interaction at this point in time had transitioned into an investigative detention *supported by reasonable suspicion*. Further, even if the Court were to accept Defendant's assertion of a seizure prior to Defendant exiting the vehicle, the Court finds Trooper Maggs' conduct was reasonable, and the seizure was justified by the community caretaker doctrine. Thus, whether Defendant was seized at the beginning of the interaction or sometime later is of no consequence to the outcome of the matter. In either scenario, the seizure was justified by the reasonableness of Trooper Maggs' actions.

I.    **The Trooper had Reasonable Suspicion Justifying the Seizure.**

While Trooper Maggs' initial response to the phone call and observation of the problem did not amount to any restraint, his subsequent actions in addressing the problem did, and must be evaluated under the Fourth Amendment to determine if there was a violation of Defendant's Constitutional rights. In other words, after initially seeing and speaking with Defendant to verify her safety, Trooper Maggs was no longer acting pursuant to the community caretaker doctrine.

---

[17] *Commonwealth v. Livingstone,* 174 A.3d 609 (Pa. 2017).

Rather, at that point in time, Trooper Maggs was conducting a brief investigation of potential driving while under the influence based upon his observations of Defendant and independent of his duty to provide assistance pursuant to the community caretaker doctrine.

*Commonwealth v. Collins* is useful in addressing the distinction between mere encounters and investigative detentions, and in evaluating the factors which may lead to reasonable suspicion of criminal activity. In *Collins*, after noticing a car parked in an unusual area at nighttime, but with otherwise no indication of criminality, the trooper there "approached the vehicle requesting information, asked if 'everyone was ok' and then [the defendant] blurted out that they were smoking marijuana. [The trooper] at that point smelled burnt marijuana and observed the bong in the vehicle."[18] The Superior Court reversed the trial court's determination that the trooper's initial interaction was an investigative detention, stating any reasonable person "would have interpreted [the trooper's] actions as an act of official assistance and not an investigative detention."[19]

Here, Trooper Maggs approached Defendant to inquire into what he perceived to be a possible safety concern, and in response to the call for a welfare check. Although there was no indication of criminal activity when Trooper Maggs arrived on the scene, upon observing the totality of the circumstances, he had reasonable suspicion of unlawful activity. Like in *Collins*, where the nature of the initial interaction naturally changed after the trooper "smelled burnt marijuana and observed the bong in the vehicle," the nature of the interaction between Trooper Maggs and Defendant here naturally changed upon Trooper Maggs smelling alcohol emanating from Defendant's breath, observing slurred, incoherent speech, and noticing a case of beer in the

---

[18] *Commonwealth v. Collins*, 950 A.2d 1041, 1047 (2008) (internal citation omitted).
[19] *Id.*

8

rear of the car with several bottles missing. At that point in time, Trooper Maggs clearly had reasonable suspicion of possible driving while under the influence of alcohol.

### The Applicability of the Community Caretaker Doctrine

It is a fundamental duty of a police officer to respond to phone calls requesting a health and safety check regarding another citizen. Trooper Maggs' appropriately responded to the call from the owner of Sunoco. While Defendant was awake when he arrived, this did not dispel with the possibility of a problem or the need to provide assistance. Indeed, the objective facts created a reasonable and articulable basis for Trooper Maggs to believe his assistance may be needed. Therefore, it cannot be argued Trooper Maggs' initial response to the call constituted a restraint of Defendant prior to asking her to exit her vehicle. This Court is mindful of drawing a distinction between these common encounters to which the community doctrine typically applies, and any subsequent escalated conduct which constitutes police investigation of criminal activity. Of course, one of the main purposes behind the community caretaker doctrine is to deter police officers from using the doctrine to conceal subjective, hidden motives or suspicions.

What is most important to note here is that Trooper Maggs' presence at the scene as an officer was *requested* to make sure Defendant was not injured or in need of assistance. This is not a situation wherein Trooper Maggs' was investigating criminality. Additionally, although Defendant was seemingly awake and talking, she chose not to exert control over the movement of the vehicle in order to leave, and instead, voluntarily remained at the scene. A reasonable person in Defendant's shoes and under the circumstances would understand the officer's initial presence as the rendering of assistance. The owner of the Sunoco station became concerned upon observing Defendant's vehicle parked in the lot for a three-hour period in the early morning

hours and after being unsuccessful in arousing Defendant. Certainly, such circumstances created a reasonable inference of Defendant's possible need for assistance.

However, as discussed above, upon discovering Defendant was safe and conscious, Trooper Maggs *immediately* noticed several indicators of intoxication such as blood-shot and glassy eyes, slurred and incoherent speech, and the immediate odor of alcohol emanating from her person. Additionally, a case of beer with missing bottles was observed in the rear of the vehicle. When Trooper Maggs asked Defendant questions related to her drinking and activities, and further asked her to exit the vehicle for a field sobriety test, he escalated his conduct to what should properly be characterized as a seizure of her person pursuant to his duties as an officer in law enforcement. At this point in time, it is clear Trooper Maggs' was no longer performing his duties pursuant to the community caretaker doctrine, and any investigation of criminality required reasonable suspicion. As previously stated, the Court finds Trooper Maggs had reasonable suspicion.

**Conclusion**

Based on the foregoing, the Court concludes the evidence supports a valid investigative detention based upon Officer Maggs' reasonable suspicion of possible criminal activity based upon the circumstances discussed herein. Although Trooper Maggs initially engaged Defendant for purposes of determining whether or not Defendant needed assistance pursuant to the community care doctrine, which need not be communicated to her, the interaction naturally progressed into an investigative detention based upon Trooper Maggs personal observations. Namely, Defendant's breath smelled of alcohol, her speech was slurred, and she seemed confused. Also, importantly, Trooper Maggs observed a thirty (30) pack case of beer in the back of the vehicle with some cans missing.

## ORDER

AND NOW, this ___12th___ day of May, 2020, upon consideration of Defendant's

Omnibus Pre-trial Motion to Suppress statements made and evidence derived therefrom and the

parties' proposed findings of fact and conclusions of law in support of their respective positions,

it is the order of this Court that Defendant's motion to suppress is hereby **DENIED.**

BY THE COURT,

_____
Jonathan D. Grine, Judge

11